Russell Greer
7901 South 3200 West
P.O. Box 152
West Jordan, Utah 84088
801-895-3501
russmark@gmail.com
Pro Se Litigant

FILED

2020 JUN -1  AM 10: 30

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

## IN THE UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | |
|---|---|
| **RUSSELL G. GREER,** | Case No.: 3:20-cv-00436 |
| Plaintiff | Judge: Waverly D Crenshaw, Jr |
| v. | **JURY DEMAND** |
| **TAYLOR A. SWIFT,** | |
| Defendant | **MOTION TO CORRECT CLERICAL MISTAKE** |

## INTRODUCTION

*Federal Rules of Civil Procedure 60(a)* and *Tennessee Rules of Civil Procedure 60.01* allows for "clerical mistakes in judgments, orders or other parts of the record, and errors therein arising from oversight or omissions" to be corrected by motion from any party. The Docketing Clerks for the Middle District of Tennessee, Nashville Division have wrongly classified the Nature of Suit of this case as a contract case, when it should be classified as a personal injury case. Plaintiff moves and asks for the Court to correct the clerical mistake by rightfully changing the Nature of the Suit to personal injury.

## FACTS

1. Plaintiff filed the Complaint with this court on May 21st.

2. The clerks assigned this case with a case number and classified the nature of the suit of the case as a contract case and classified the cause as a breach of fiduciary duty.

3. Plaintiff called the clerk on May 22nd and asked her to fix the designations, as his Complaint has nothing to do with fiduciary duty or contracts.

4. The clerk seemed annoyed, as if she disagreed with his cause of action. She spoke condescendingly to Plaintiff and said that he's pro se and said along the lines of, "you don't know what you're arguing," disregarding the fact that Plaintiff is a paralegal and had his Complaint proofread by a legal professional before filing the Complaint.

5. The clerk changed the cause to "28:1332, diversity: personal injury," but left the nature of the suit as "190 contract – other contract." EXHIBIT A.

6. Even after filing his civil cover sheet, which listed the case as a tort personal injury case, the nature of the suit remains as a contract case.

7. Feeling that phone calls will not do anything, Plaintiff files this Motion to Correct the Clerical Mistake.

# CONTRACT IS NOT INVOLVED IN THIS CASE

This case's cause of action simply and coherently argues that Plaintiff relied on Defendant's publicity and was harmed by relying on her representations by discovering that she didn't mean what she conveyed and his reliance caused harm to him, directly by Swift and by third party tortfeasors. Greer has never claimed Swift was in a contract with him. In fact, no contract is required to establish this cause of action. In paragraph 78, of Plaintiff's original Complaint, Plaintiff even states that "no privity of contract is needed to establish liability," and he briefly cites case law and Tennessee law to back up his claim.

Although reliance is a contract term, it is also found in tort law. "*While the law of contracts gives to a party to a contract as damages for its breach an amount equal to the benefit he would have received had the contract been performed, the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.*" RESTATEMENT (SECOND) OF TORTS § 901 comment a (1979). See also, *THE PHANTOM RELIANT INTEREST IN TORT DAMAGES.* University of San Diego School of Law. (1992). Putting a person back in a position if they had not been harmed is reliance and essential to torts. An example of reliance in tort law could be as simple as a person crossing the street, relying on a car to stop because the pedestrian had the right of way, but ends up getting hit by the car. Several cases have found that reliance is essential in damages. "The purpose of compensatory damages [in tort law] is to make an injured person whole." *Columbus Fin., Inc. v. Howard,* 327 N.E.2d 654, 658 (Ohio 1975).

Maybe the term "*reliance*" confused the court clerks, but the clear Counts and claims for relief stated negligence and infliction of emotional distress, which are personal injury concepts. *Negligent Infliction of Emotional Distress Claims (NIED).* AllLaw. (https://www.alllaw.com/articles/nolo/personal-injury/negligent-infliction-emotional-distress.html). (states, "Negligent infliction of emotional distress" (NEID) is a personal injury

law concept.") Therefore, the clerks made a mistake by designating the case as a contract case. Greer even consulted the legal professional who proofread his complaint to see if maybe he wasn't clear in what he was arguing and she stated that she never thought he was arguing a contract case. EXHIBIT B.

## DESIGNATION IS IMPORTANT

It important for this Complaint to be appropriately classified for a few reasons. The first being is so that the Court is aware as to what Greer is arguing and how to analyze the Complaint. If the Complaint is listed as a contract complaint, then the Court might use a contract analysis with the Complaint, which would be prejudicial to Plaintiff because that is the entire point of Greer's arguments: no contract is needed to establish liability. One of the reasons Greer explained in detail for Count 1 is this very reason: he didn't want his Complaint to be wrongly analyzed.

The majority of society, even some in the legal community, are unaware of the several cases that state contract is not needed to establish liability or a duty. Maybe that's why the clerks made their mistake; however, it's enshrined in the case law of this very circuit. The 6th Circuit has an abundance of case law which states that no contract is needed by a third party to bring suit for damages. "..Imposes a duty in favor of all those third parties who defendant knows will rely on the information and to third parties who defendant should reasonably foresee will rely on the information. *There is absolutely no fiduciary or privity requirement in order to establish the element of duty under this claim*." *Molecular Technology Corp. v. Valentine* (6th Cir. 1991). Wrongly assigning this case as a contract case would be going against 6th Circuit precedent, which states fiduciary duty is not needed for liability.

Secondly, it just makes no sense to designate this case as a contract case. In the *Civil Nature of Suit Descriptions* provided by the US Courts, the description for the designation assigned to this case reads: "*190 — Other Contract: Action primarily based on rights and*

*obligations under a contract not classifiable elsewhere under the specific natures of suit under*

*'Contract'.*" *Civil Nature of Suit Descriptions.* US Courts.gov. (2019)

([https://www.uscourts.gov/sites/default/files/js_044_code_descriptions.pdf](https://www.uscourts.gov/sites/default/files/js_044_code_descriptions.pdf)) (2019). Nowhere in

Greer's Complaint does it state he was in a contract with Swift. To designate it as so is

essentially putting words in Plaintiff's mouth that he never uttered; putting words in his

Complaint that he never wrote.

Third, besides the wrong code designation being possibly prejudicial to Plaintiff, the

correct code designation is pertinent to helping courts. Courts and court administrators frequently

use NOS codes in their work. It is used for statistical reporting, allocation of funds and helping

court administrators and judges with workload. *The Use and Reliability of Federal Nature of Suit*

*Codes.* Penn Law: Legal Scholarship Repository. (2017).

Lastly, an outside observer or a news reporter could look up the case without reading the

Complaint and see the cause as contracts and spread false information that Greer is suing Swift

for contracts. Such assertions would be defamatory to Plaintiff and portray him in a false light.

Greer has amended his Complaint to make it as clear as possible that he isn't suing Swift for

contracts, and that even with a lack of a contract, a duty is still established to third parties like

Greer, based on controlling and persuasive case law and public policy, when Defendants act

negligently in a way that their conduct will affect third parties not in privity to them.

### CONCLUSION

With the argument laid out as to why the wrong nature of suit code designation would be

harmful to Plaintiff, Greer moves for the Court to have the docketing and court clerks fix the

clerical mistake on the record pertaining to the nature of suit by changing the code designation

from "190 Contract - Other Contract" to "360 - Other Personal Injury".

Respectfully submitted,

DATED:  May 27th, 2020

Respectfully submitted,

By:

Russell Greer
Pro Se Litigant
/rgreer/

## CERTIFICATE OF SERVICE

I certify that on May 24th, 2020, a true and correct copy of MOTION TO CORRECT CLERICAL MISTAKE was emailed to the following:

Douglas Baldridge, jbaldridge@venable.com

**EXHIBIT A**



# Greer v. Swift



## Tennessee Middle District Court

| | |
|---|---|
| **Judge:** | Waverly D Crenshaw, Jr |
| **Case #:** | 3:20-cv-00436 |
| **Nature of Suit** | 190 Contract – Other Contract |
| **Cause** | 28:1332 Diversity-Personal Injury |
| **Case Filed:** | May 21, 2020 |

Docket    Parties (2)    News

**+ Navigation**                    🔔 Create Alert

**Docket last updated: 05/22/2020 11:59 PM CDT**

🗘 Update Now

## Friday, May 22, 2020

**EXHIBIT B**

May 22, 2020

Did you think it was a contract case when you read it?

10:26 AM

Today

 No. totally not. What are the consequences of its mislabeling?

5:08 PM

**Me**

I could only think of possibly being sent to a judge who does contracts and maybe misconstruing my cause of action.

So I'm filing a FRCP 60(a) Motion to fix clerical error. Since the clerks won't change it, I guess a motion explaining the situation is the only way I can

5:42 PM

Type a message...



Russell Greer
7901 mmh kii pu South 3200 West
P.O. Box 152
West Jordan, Utah 84088
801-895-3501
russmark@gmail.com
Pro Se Litigant

# IN THE UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | |
|---|---|
| **RUSSELL G. GREER,** | Case No.: 3:20-cv-00436 |
| Plaintiff | Judge: Waverly D Crenshaw, Jr |
| v. | **JURY DEMAND** |
| **TAYLOR A. SWIFT,** | |
| Defendant | **PLAINTIFF'S FIRST AMENDED COMPLAINT SEEKING DECLARATORY RELIEF** |

## NATURE OF THE ACTION

1.      In a world where safeguards and disclaimers are put into place at every turn for consumers and those wishing to do business with others, there are surprisingly no safeguards or disclaimers utilized by world famous celebrities, whose influences can be felt internationally, to minimize or avoid potential damages. Defendant Taylor Swift happens to have such an influence, which has resulted in a nearly four year long harm to Plaintiff Greer, which has resulted in giving Greer post traumatic stress disorder (PTSD) and has given rise to this Complaint.

2.      Since the inception of the American judicial system, courts and legal scholars have held and argued that those who create misrepresentations, can be held liable for harm suffered by third parties, when those third parties rely on information that risks their safety, physically and monetarily. RESTATEMENT OF TORTS (2D) §§ 552 and 311.

3.      Celebrities and public figures can already be held liable by the *Federal Trade Commission* (hereby collectively referred to as the "*FTC*"), per *16 CFR §255,* for negligent endorsements and for failures to warn, in regards to the endorsement of products, though, only the *FTC* can bring action against celebrity endorsers in regards to products. However, there are no restrictions precluding a private party to cite and use said federal statute as persuasive authority for actions not based on the statute, per se. *Guides Concerning the Use of Endorsements and Testimonials in Advertising.* Federal Trade Commission. (https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-publishes-final-guides-governing-endorsements-testimonials/091005revisedendorsementguides.pdf).

4.      This is a civil action seeking monetary damages for the negligent actions of Defendant Taylor Alison Swift (hereby collectively referred to as "Swift" and/or "Defendant") for her failure and breach of duty to use disclaimers in connection to her publicity stunts and intellectual property, of which have resulted in monetary damages, emotional damages, economical damages

and physical damages to Plaintiff Russell G. Greer (hereby collectively referred to as "Greer" and/or "Plaintiff"), as he relied on Swift's publicity stunts and her intellectual property.

## JURISDICTION

5.    The jurisdiction of this Court is based upon 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## PERSONAL JURISDICTION AND VENUE

6.    Personal jurisdiction over Defendant is proper in this Court on the grounds that:

(a) Defendant transacts substantial business in the State of Tennessee; (b) Defendant owns two homes within the State and within this Court's jurisdiction, to which she regularly lives in and (c) Defendant's management companies (13 Management and Taylor Nation) are incorporated within the District.

7.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391.

## PARTIES

8.    Plaintiff Russell G. Greer resides in the State of Utah. He is 29 years old and has his paralegal degree. He was born with a facial disability termed, *"Moebious Syndrome,"* which means that he can't close his mouth and talk clearly, thus making daily life activities such as communicating, eating, drinking and being in public difficult.

9.    Defendant Taylor Swift is an internationally famous, award winning artist, who is a year and a half older than Russell Greer. Swift is celebrated by the media for being supposedly compassionate and open with fans.

## GENERAL ALLEGATIONS

### A.  SEEING SWIFT'S REPRESENTATIONS

10.     Plaintiff Greer has always wanted to get into the entertainment industry. With a disability that limits Greer's expressions, though, it is difficult to do so, given that the business is already competitive enough.

11.     Throughout the years, Greer saw Defendant Taylor Swift interact with fans who reached out to her. These interactions consisted of showcasing invites to red carpet events; simple gifts, such as gift cards and quilts, on Twitter; accepting prom and military ball invites; inviting girls, who made paper cranes for Swift's ill mother, to a concert of hers. While the interactions varied, they established a reoccurring theme: Taylor Swift is open to accepting gifts and life stories from fans. She endorses such conduct. But it hasn't all been subtle: she has openly been generous and is constantly on the look out to help others. *A Timeline of Taylor Swift's Generosity.* Billboard. (2018).

([https://www.google.com/amp/s/www.billboard.com/amp/articles/news/8481430/timeline-taylor-swift-generosity](https://www.google.com/amp/s/www.billboard.com/amp/articles/news/8481430/timeline-taylor-swift-generosity)).

12.     Besides the fan interactions, Swift gave several interviews to promote her music, where she expressed that certain things inspired her.

13.     In an interview to promote a movie she wrote music for, Swift states that she did the project because the story of a man who never gave up on his dreams, "inspired" her. *One Chance – Exclusive First Look with Taylor Swift.* YouTube. (2013) ([https://youtu.be/Fer9HPXu8yo](https://youtu.be/Fer9HPXu8yo)). Exhibit A (shows Swift's misstatements that were broadcasted and Greer's reliance on them).

14.     In a voice over for the music video of her song, "*New Romantics,*" Swift says that "the fans are the best part." *New Romantics. Taylor Swift.* YouTube. (2014). ([https://youtu.be/wyK7YuwUWsU](https://youtu.be/wyK7YuwUWsU)).

15.     For further influence, on a charity website that lists the charities that celebrities support, Taylor Swift is listed as supporting several charities for those with disabilities: ALS Association, Cancer Research Institute, Make-A-Wish Foundation. This all inspired Greer that Swift would be

open to his intentions as a disabled man. *Taylor Swift Charity Work, Events and Causes*. Looktothestars.org. (2020). (https://www.looktothestars.org/celebrity/taylor-swift). EXHIBIT B. As a side note, even charities, including the ones that Swift supports, have disclaimers. *Better Safe than Sorry: Nonprofits' use of Waivers, Releases and Disclaimers.* CharityLawyer. (2013). (https://charitylawyerblog.com/2013/02/26/better-safe-than-sorry-nonprofits-use-of-waivers-releases-and-disclaimers/).

16.     Many commentators, including *Forbes*, have suggested that Swift portrays the All-American Girl, championing the images of others to enrich her career. *Is Taylor Swift Profiting Off The LGBT Community? Yes, But She's Helping As Well*. Forbes. (2019). EXHIBIT C.

## B. RELIANCE UPON SWIFT'S ENDORSEMENTS

17.     Seeing these interactions and seeing her spoken words, inspired and ***influenced***  Greer to reach out to Swift. Swift's conduct created misrepresentations because she apparently didn't mean what she endorsed or conveyed. Misrepresentations can be more than words – they can include "conduct not in accordance with the truth," which includes opinions, with no privity of contract required. *RESTATEMENT (SECOND) of TORTS § 525.* (1977).

18.     Greer spent years conjuring up a grand idea to impress her, in reliance of her actions and spoken words, so that he could stand out. His idea was to stand out by writing a song ABOUT Swift as an appreciation song to thank her for helping him get through life with her music. It was an appreciation song from one musician to another. He hoped that Swift would be flattered by his efforts, his life story. And if she was, he hoped doors could be opened. If not, he hoped for similar favorable results like the fans mentioned above received. Some of Greer's legal professors chided him for reaching out to Swift, as they thought it unprofessional and nonsensical.

19.     Greer hired an online production company to produce the song he wrote about Swift, "*I Get You, Taylor Swift*.". He hired them because they were cheap. After the song was finished, Greer

was horrified by the finished product, as it sounded nothing like what he wrote. He couldn't get a refund.

20. During this time, Greer had moved to an apartment from renting a room in a house and he was making 11 dollars an hour, so he didn't have the funds to redo the song. Given that the quality of things Swift received weren't all that great, the bar was set low to impress her. Greer just felt in his gut that it was the time to reach out to her. So Greer produced a simple video for the song, with his brother narrating, to add more depth and ingenuity to what he was sending. While it wasn't the best, it was far from the worst and showed genuine effort and conveyed a message of an underdog — the same underdogs Swift said that she finds inspiring throughout the course of her profession. Greer also had other musical works, that were better quality, he was going to reference to if Swift questioned or was curious about his musical talent, to truly show he was talented and that the production was bad, but it was what he could afford at the time and that it was made with sincere intentions. But Greer was only sending Swift a gift song video about her and nothing else.

21. During July 2016, Greer contacted Swift's management team with his gift and a desire to have it passed onto Taylor.

22. Jay Schaudies, one of Taylor's managers, replied to Greer's email and stated that Swift doesn't accept unsolicited music, which led Greer to believe that Jay thought Greer was trying to get Swift to do a song he wrote, rather than a gift song about her.

23. It's important to know this *difference* because if he was just trying to get her to do his song and they cited unsolicited policies, Greer would have accepted that and moved on with his life. But because he relied on Swift's misrepresentations, he invested so much time and money into writing a song ABOUT Swift to flatter her, a GIFT to give to her, and felt it unfair that he invested that and was not able to show her. Not only did he feel it was unfair, but he felt

embarrassed that all his friends knew — and supported — his efforts of impressing Taylor and he felt that all of that effort, just to be blown off, would be humiliating.

24. Schaudies later called and left a message on Greer's phone, again emphasizing that Swift can't do his music, as her record label or contracts won't allow it. Schaudies never mentioned anything about the gift, thus reinforcing his cluelessness. Greer has evidence that Schaudies never mentioned anything about a gift, thus there was negligence with understanding what Greer was trying to do. A transcription from the voice mail shows this. EXHIBIT D.

25. Greer was heartbroken, but also annoyed that her agents couldn't figure out what he was trying to pass on. He saw this as negligence.

## C. SWIFT HAS ACCEPTED UNSOLICITED MUSICAL GIFTS BEFORE

26. For clarification: Swift HAS accepted unsolicited, musical gifts and showcasings before. Swift accepted a very cheesy compilation of her songs, sung by a singer named Todrick Hall, who comes into play later in the general allegations. She also accepted other musical covers of her songs. Swift was made aware of the "next Taylor Swift" girl on America's Got Talent. Greer saw all of this, which inspired him to act. It would appear her agents never made a fuss about these, if they do truly control what she listens to, in order to keep her from violating her contracts that Jay spoke so endearingly about. This all matters because it shows an *arbitrary policy* on Swift's part that she doesn't adhere to; it shows that the agents *didn't know what* he was trying to send, if they do allow gifts, and lastly, it further *creates a representation* that Swift accepts musical gifts.

27. Greer knew of no other way to get through to Swift. Whether he should have re-produced the gift or not is a moot point since the managers didn't know it was a gift, nor did they listen to it or watch it because in Jay's first email, he states: "this will not be forwarded *or opened.*"

28. During this time, Swift was on the news for many frivolous lawsuits that were filed against her. This inspired Greer that the only way he could get her attention was by bringing awareness

to her managers' negligence. Under the law, this is called "vicarious liability". The principal (Swift) is responsible for the agents' conduct. With that said, he filed a small claims court complaint in October 2016. Not to harass; not to stalk; but to bring attention to a legit claim of negligence from her agents.

29.    Again, Greer was only doing the small claims court action because he truly believed she would see it. An article regarding "vicarious liability" stated that suing under that theory brings the likelihood that the complaint will be resolved by the principal. Although his action was unconventional, it was thought out and filed with good intentions. The trial was set for December 2016.

30.    Realizing that Swift isn't forced to accept or do anything, Greer just at least wanted to have the opportunity to show her, since he relied on her representation. Also, he was beginning to be slightly harassed on Reddit, an online forum, because he had been open about flattering Swift and so Greer didn't want the harassment to be for naught. Greer would get random messages on his social media, with people telling him that "he's too ugly for Taylor Swift." So Greer didn't want the embarrassment or the harassment to be for nothing, in addition to the representations he relied on.

31.    A psychological/academic theory reinforces what Greer was trying to achieve: "Expectancy violations theory (EVT)." This theory analyzes how individuals respond to unanticipated violations of social norms and expectations; it's a form of social disruption. *Nonverbal Expectancy Violations: Model Elaboration and Application to Immediacy Behaviors.* Communications Monographs. Issue 55. Hale, J.L. (1988). *Harvard Business Review* states that this social disruption is a positive way at getting one's attention, as it causes interest. *7 Ways to Capture Someone's Attention.* Harvard Business Review. (2015). Although backed up by law, what Greer was doing was unconventional and breaking a social norm.

## D. RELIANCE NOT WELCOMED

32.   A month later, Swift, through Utah lawyer Greg Skordas in a Motion, stated that Defendant Swift was bothered by Greer, apparently not understanding what he was trying to do. Greer was shocked. He showed his friends and verified if those words meant what they read and the friends agreed. Greer was shattered. He honestly felt discriminated against because he had sent a video explaining himself and the video clearly showed how Greer looks and talks.

33.   Shortly before the date of the trial, Greer reached out to news outlets to carry coverage of the lawsuit. Although Swift purportedly knew about Greer, Greer continued with the facts of the small claims lawsuit of how her agents were negligent, but added in that by default, Swift was liable for their conduct. He also chided Swift for not trying to understand.

### E. HARM FROM THE RELIANCE

34.   On December 8th, 2016, the news began coverage of the lawsuit, but they omitted all of Greer's arguments or the basis of the lawsuit and rather smeared him with off-the-cuff remarks he had made, thus making Greer look deranged and foolish.

35.   The news was covered in various publications, nationally and internationally, including the United Kingdom's, *The Daily Mail. Taylor Swift Sued After Her Agents 'Stonewall' Russell Greer's Efforts to Make Music.* Daily Mail. (2016) (https://www.dailymail.co.uk/news/article-4012828/Utah-man-sues-Taylor-Swift-agents-stonewall-efforts-make-music-her.html). The title of the headline alone proves that the news negligently and cluelessly reported on what Greer was trying to achieve or the basis of his lawsuit. Nothing in the article talks about vicarious liability or that Greer had created a gift song, not a song for her to do.

36.   At the trial, the judge was rude, snarky and wouldn't let Greer present arguments or evidence. He scoffed and rolled his eyes at Greer. The case was dismissed for lack of jurisdiction, while the judge did touch on the points of negligence.

37.   With more defamatory articles of the misunderstood event, the ire surrounding Greer only increased.

38.    Greer began to be harassed. It was the Christmas season when this all transpired and Greer would have to wear a hoodie and a ski mask to avoid being recognized while looking at Christmas lights with his sister because people would shout, "That's the guy who sued Taylor." People would shout at Greer that he's "stupid". Because of his disability, people would conclude that he "must be retarded too." Not only was Greer accosted in person, internet slander and harassment began to form of him. A large troll website began to dox Greer, publishing all of his personal information and his family's information. Some began creating fake profiles of Greer, with one superimposing Greer's face onto a guy who is grabbing Taylor Swift's butt, thus falsely implying that Greer sexually assaults women. Above the crude photo is a fake conversation that never took place, which implies that Greer stalks Swift, which is also false. EXHIBIT E.

39.    Greer's place of employment, a law firm, began to get bombarded with hate mail. The head attorney and Human Resources chided Greer. People close to him began to steer away from him.

40.    Defamatory wikis began to be created of Greer, stating half-truths and bald faced lies.

41.    Greer had to delete social media accounts because of the harassment. In addition, trolls created fake email accounts purporting to be Greer and began harassing his birth family, whom he was trying to form a relationship with, after being put up for adoption as a baby. They also created accounts of him on Reddit, pretending to be him, when he had never used Reddit during that timeframe. That relationship is now forever ruined because of what the trolls did.

42.    The day after the trial, Taylor Swift released her song, *I Don't Wanna Live Forever,* on December 9th.

43.    The Daily Mail referred to the release as a "surprise-drop," proving that Swift knew about Greer and was trying to cover up the incident. *Taylor Swift and Zayn Malik* **surprise-drop** *new collaboration I Don't Wanna Live Forever for the Fifty Shades Darker soundtrack... and it reaches number one on iTunes in just one hour.* Daily Mail. 2016.

44. In 2017, Greer decided he would write a book about the event to try clearing his name and share his side of the story.

45. In October of 2017, Greer was fired from his law firm, due to mounting harassment against the firm from trolls.

46. Even after getting fired, the harassment continued, with suspicious packages being sent to him. EXHIBIT F.

47. Greer published and released the book on Amazon in November 2017.

48. The book was entitled, *Why I Sued Taylor Swift and How I Became Falsely Known as Frivolous, Litigious and Crazy.* Amazon. (2017). EXHIBIT G.

49. Unsurprisingly, like a pack of killer wasps, the trolls plagued the book with bad reviews. Some even violated Greer's intellectual property by posting it online for others to read, causing Greer to be deprived of money.

50. Because of the hate reviews, Greer has been unable to market the book and thus any attempt at clearing his name or showing his intentions are ruined.

51. Shortly after getting fired, Greer got evicted from the home he was renting a room in. EXHIBIT H (shows eviction notice and unemployment),

52. In haste to find lodgings, Greer rented a room in a duplex owned by an older lady. Greer felt like a prisoner in that house. The lady lied about many things. She would lock the door and Greer had no house key, so in a way, he was homeless.

53. Greer, jobless and homeless, while still receiving severance payments, would desperately search for work.

54. Greer found a job as a paralegal with a debt collection law firm in November 2017, but after two days of employment, they fired him because of Taylor Swift. The lawyer stated that because Greer sued Taylor, it meant somehow that Greer would steal company data.

55. Greer ended up being employed washing fire fighter uniforms, for low pay, and ended up getting fired from that job because the stress from the fallout was eating away at his emotions and work ethic. He was depressed that he went from a professional job to a job he was only at so that he could survive.

56. Without any car and no bus stop near the duplex, Greer had to walk a mile in the 10 degree weather during the cold November and December winter. Sometimes, Greer felt hopeless.

57. Whenever Greer tried finding work or housing, the Taylor Swift thing always popped up. He was denied many jobs because of Taylor Swift. While Taylor was living the good life, a man who relied on her representations was homeless and jobless.

58. In 2017-2018, Greer was fired from 5 jobs and denied many more jobs, even though he was perfectly qualified for the jobs, all because of Taylor. He knows the firings were because of Taylor because he was told so or when the denial was more subtle, there would be a sudden reversal of decision, as if they had found concerning information about him. Greer finally found an office job at the end of 2018, even though it only paid 12 dollars an hour.

### F.  GREER'S PTSD DIAGNOSIS STEMMING FROM SWIFT

59. In July of 2019, Greer was diagnosed with post traumatic stress disorder (PTSD) stemming from Taylor Swift. EXHIBIT I. In the diagnosis, Greer's therapist, who will be referred to as M, as she has requested privacy, stated that she was helping Greer control his moods and help him with his feelings towards Taylor Swift.

60. Greer's PTSD is triggered when he hears Swift's music in stores or at the gym. It's triggered when he sees her face in articles or on magazines. To describe it in the best way possible, it's like a light switch is being flickered on and off at a fast rate when he sees her face or hears her music. His heart beats at a fast rate when he sees her image. He gets sick as if somebody has punched him in the gut. His head tightens and he has had to see a neurologist. Greer finds himself talking to himself. He has to wear headphones in the store to avoid hearing

her music. His PTSD has put disturbing thoughts in his head that he has confided to his counselor about, but he does not feel comfortable including in this Complaint. He takes medicine twice a day (lamotrigine) and at night (clonidine) to cope with his pain. He has to take melatonin also in order for him to sleep. To be clear, it's Taylor Swift who gave him and who triggers his PTSD, not the trolls, firings, etc. Those were just contributing factors because Taylor Swift has been the stated reason for the chain of events and it's burnt into Greer's mind how little he felt when he read those words that purported to be from Swift.

61.    To help with his pain, Greer wrote a song about his experience and professionally produced it. The song was featured on a few radio programs. Again, it was plagued with hate.

62.    Greer decided he would try helping his PTSD by trying to get closure by reaching out to Swift, so she could know how much everything hurt, and hopefully, try to move on. Greer explained to his therapist what he was trying to do and she agreed it could be a good way to get thoughts off his chest by telling Swift personally.

63.    Greer hired a publicist (an Alvin of New York who owns a mid-level public relations firm) he found on Upwork.com, a site where you can hire professional freelancers, who had a connection who is close friends with Taylor: Toderick Hall.

64.    In December of 2019, the song and a video detailing his pain was passed on to Toderick, who then passed it onto Taylor.

65.    A week later, a Mr. Jackson with Viacom (full names not given) wrote a Cease and Desist letter on behalf of Swift, telling Greer to stop reaching out to her. The letter fractured Greer's relationship with Alvin, with Alvin saying, "Thanks a lot. You just ruined any chance I had of ever working with Taylor Swift." It also soured Alvin's relationship with Toderick's management. Needless to say, the further rejection hurt Greer.

66.    Greer gave so much and lost so much because he relied on Swift's representations, which led to developing PTSD. The pain that she continues to help others and continues to give

misleading statements does not help his mental state. The pain is worsened when she is celebrated by the media and is flanked with awards. Time Persons of the Year do not act as Swift has acted. Everybody seems to think she's perfect and Greer has been shamed into silence from sharing his allegations and pain. With filing this Complaint, Greer has been called "crazy," despite doing thorough research.

67. Further, the harassment and the stigma still follows Greer. People will comment and say, "don't sue me," mocking the Swift ordeal. Or when Greer has tried moving on, Taylor Swift always seems to find a way back to haunt Greer. For instance, Greer has advocated for the legalization of certain things not related to this Complaint, and the reporter, who interviewed Greer, included in her article, Greer's connection to Taylor Swift and the reporter questioned that Greer might be a misogynist because of the incident with Taylor, practically defaming him. When Greer confronted the reporter about her article, she stated it was information that was needed to be shared. Greer is unsure how suing for vicarious liability equates to how he views women. Similarly with this complaint, suing a female public figure for failing to warn does not mean he is sexist.EXHIBIT J.

68. Greer believes this all could have been avoided had Swift used disclaimers in her publicity stunts and interviews and cautioned that her views were not sweeping advances or subtle invitations. It's a simple "but for" analysis. But for Taylor's use of a disclaimer, this entire mess could have been avoided, as Swift created the situation that led to the intentional acts of trolls, libelous articles, etc.

69. Finding out that Swift didn't mean what she implied or stated, and that she was bothered by good intentions, dealt an emotional blow to Greer that crippled him emotionally and gave him PTSD.

70. A simple disclaimer would have grounded Greer and not caused him to go to extremes to get her to see his plight, such as going onto international news to try to show her managers'

negligence. And if she had utilized a disclaimer and he still went through with everything, it would be on him to accept the outcome.

71.    Greer files this Complaint before the statute of limitations, pertaining to injuries to the person, expires on his one year PTSD diagnosis date: July 16th. *Tennessee Code 28-3-104(a)(A).*

## G. DISCLAIMER WOULD REMEDY FUTURE LITIGATION

72.    Finally, before laying out his claims for relief, Greer acknowledges that a potential problem to his Complaint would be that Defendant Swift could be opened up to liability to any member of the public; however, future and potential litigation could be prevented with a utilization of disclaimers and caution. Plaintiff hopes that this Complaint would cause Swift and other public figures to be more prudent in the future. *Youssoupoff v Metro-Goldwyn-Mayer* (1934) 50 TLR 581, CA (The English Court of Appeals held that a film defamed Princess Youssoupoff. Case prompted movie studios to utilize the "All Persons Fictitious" disclaimer). *"Any Resemblance to Persons Living or Dead": Film and the Challenge of Authenticity.* The Yale Review, 86 (1986-87).

(https://web.stanford.edu/dept/HPS/HistoryWired/Davis/DavisAuthenticity.html).

## H. NO CONTRACT NEEDED TO ESTABLISH LIABILITY

73.    Contrary to public misconception that one must be in a contract with another to establish liability, that is not the case with the 6th Circuit. An abundance of cases have argued and found liability for negligence in various forms (simple negligence or negligent misrepresentation), where Plaintiffs relied on Defendants' words or conduct, and were third parties and had no privity of contract. "Imposes a duty in favor of all those third parties who defendant knows will rely on the information and to third parties who defendant should reasonably foresee will rely on the information. There is ***absolutely no*** fiduciary or privity requirement in order to establish the element of duty under this claim." *Molecular Technology Corp. v. Valentine* (6th Cir. 1991).

## COUNT I

### Negligence - Failure to Warn

74.     Russell Greer realleges each and every allegation in paragraphs 1 through 73 as fully set forth herein. Further, all claims set forth are derived from previous tort law framework.

75.     Long standing case law holds that in certain "circumstances" and with higher responsibility, based upon the risk of harm, there is a duty to warn. *Marine Terminals v. Burnside Shipping Co.,* 394 U.S. 404, 415 (1969) (holding that there is a duty of care "under the circumstances").

76.     Realizing that Complaints must comply with the "short and plain statement" rule of *FRCP 8(a)(2)*, several persuasive factors must be presented to establish the elements of this Count, which will be laid out as concisely as possible in order to fully state a claim for which relief can be granted and to show that this suit isn't frivolous. *Washington v. Grace,* 353 F. App'x 678, 680 (3d Cir. 2009) (held that an 80 page Complaint didn't violate *Rule 8*) Truthfully, the actual Complaint is only 26 pages. The Complaint's additional length is due to the attached exhibits.

77.     Swift, as a public figure and an internationally, famous celebrity, has a right to publicity, which allows her to sway, entice, captivate, promote and make a profit off of her name, image and works. *Memphis Development Foundation v. Factors Etc., Inc.,* 616 F.2d 956 (6th Cir. 1980)

78.     As an owner of her intellectual property, though, Swift's rights do not go unchecked. Property owners who own real property are liable for failing to warn of "hidden or latent dangers" to invitees, licensees and trespassers. *Blair v. Campbell,* 924 S.W.2d 75 (TN 1996). This preexisting property law can extend to intellectual property owners. *Memphis Development,* which the 6th Circuit reviewed a case of the right of publicity of Elvis to be had by his kin after his death, based on the "treatment of similar rights". *Id* at 960. Therefore, "similar rights" can also include similar liabilities and duties that real property owners hold and extend to intellectual property owners and celebrity influencers.

79.     Further, it is codified in U.S. law that public figures and endorsers who fail to warn and misrepresent with the products that they endorse, can be held liable. *16 C.F.R. 255.1(a),* coupled with *16 C.F.R. 255.5(b),* which says that the use of a disclaimer (or warning) could prevent FTC civil action.  And though the FTC Guides lack the force of law, they can be used in deference since they have the power to persuade. *United States v. Mead Corp.,* 533 U.S. 218, 234-35, 121 S. Ct. 2164, 150 L. Ed 2d 292 (2001). They create public policy.

80.     Lastly, ***no privity of contract*** is needed to establish liability. *Hanberry v. Hearst Corp.,* 276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (1969) (Court held that the magazine was liable to third parties, based on public policy).  Additionally, *Tennessee Code 29-34-104* states: "In all causes of action for personal injury... privity shall not be a requirement to maintain such action."

## A.  DUTY

81.     With all tort law framework laid out, Defendant Taylor Swift owed a duty to Plaintiff to have disclaimers that her publicity stunts to further her career were not sweeping advances; disclaimers not just to him, but to all consumers of her music; to those who follow her on her social media and who rely on her representations, publicity and intellectual property: foreseeable, readily identifiable third parties. And although she should have used disclaimers broadly, Greer is only arguing this case as applied to him and the damages he has sustained.

82.     Swift owes this duty because she is a prominent public figure and she should have known that her *conduct created a risk of harm* to identifiable third parties by them relying on her representations and endorsements. The risk is created by her failing to warn that her publicity stunts and endorsements are not sweeping advances, nor is there a disclaimer of any guarantee of equal recognition or receiving any endorsements or receiving charitable donations from Swift .

83.     This duty can easily be found with a property law type failure to warn analysis, as Swift owns her image and publicity, or a duty analysis based on public policy by relying on FTC guides and case law concerning public figures using caution with their actions. *Satterfield v.*

*Breeding Insulation Co.,* 266 S.W.3d 347, 355 (Tenn. 2008) (Duty is owed to strangers when conduct creates risk).

84.   Denying that Swift owes a duty is essentially saying that she does not have an international influence, which is false, as she has used her name and star power to influence voters and Congress. *Trump's White House dismisses Taylor Swift's VMA plea, calls the Equality Act 'poison'.* Los Angeles Times. (2019). (https://www.google.com/amp/s/www.latimes.com/entertainment-arts/music/story/2019-08-27/trump-taylor-swift-equality-act-vmas%3f_amp=true).

## B.   BREACH OF DUTY

85.   Swift breached her duty by failing to warn that her words, conduct and endorsements were exclusive for the cause she was endorsing to enrich her career. She breached her duty by failing to utilize some clear disclaimer that her actions were not sweeping advances.

86.    Public policy dictates that Swift should have utilized disclaimers. The supporting public policy for this claim are federal statutes governing public figure endorsements and an abundance of case law imposing duties to third parties. Even opinions and personal beliefs held by public figures are scrutinized under public policy. *Kennedy v. Bremerton School District* (9th Cir. 2017) (the circuit ruled that the football coach acted as a public employee and praying on the field was not protected).

87.    Thus, it is appropriate for this complaint to be filed against Swift, as the harm can be traced back to her failure to warn. "The nature of the tortfeasor's [Swift] breach is that *[she]* created the risk of the second tortfeasor's [trolls, defamation, etc.] [intentional] act." *Turner v. Jordan* (TN Supreme Court 1997).

88.   Plaintiff has gone to the police about the trolls, but the *Communications Decency Act* protects websites from third party conduct, even though the site owner is actively involved.

Plaintiff has gone to his Senators to change the laws and his pleas fall on deaf ears. Greer tried suing the site owner for IP infringement, but after consulting with an attorney, the conclusion was that the site owner has no assets, so it would make the entire litigation process meaningless and costly for no reason. So this Complaint is against Swift, who created the risk, as explained in the case law, and who inflicted upon him PTSD, as she failed to warn.

89. Swift's breach of duty is further supported by RESTATEMENT OF TORTS (2D) §§ 552 and 311, which both find liability for information negligently supplied for the guidance of others through the course of one's profession that causes harm.

90. She negligently supplied information to further her own interests with her words and actions to her fans and consumers, by touting their gifts and praising them and supposedly fighting for minorities, that guided Greer to do as previously explained, and she failed to warn. Actions are just as strong as words and can create an endorsement.

91. Greer isn't saying that Swift doesn't have a choice to choose which charities she gives to or which projects or people she endorses, Plaintiff is clearly stating that when she makes such endorsements to further her career, she use a disclaimer or some other warning that would have averted the losses that Greer has suffered. No common knowledge can be found in terms of if Swift meant for her publicity to be sweeping advances or not. If he did, he wouldn't have undertook what he went through. In terms of common sense, all arguments point to disclaimers, as she made them to further her career. *Amendola v. R.J. Reynolds Tobacco Co.* (6th Cir. 1999) (A smoker couldn't recover for damages because of common knowledge with cigarette warning labels).

## C.   CAUSATION

92. The harm can be traced to Swift, as explained with the *Turner* case: she created the risk with her breach of duty. The defamatory articles stem back to Swift and the trolls cite Swift as one of the reasons for harassing Greer. Swift should have known that by negligently and

carelessly making such misrepresentations, she would be risking the safety of those who wanted that same recognition. She risked Greer's safety by creating a situation that put him in the crosshairs of trolls who have made him physically and mentally fear for his life; such mental trauma has resulted in physical ailments with his PTSD. Mental and physical ailments stemming from giving his all to impress somebody he cared about, only to be left in the mud by her.

93.     Undoubtedly, Swift is aware of cyber bullying because she wrote a song about how "haters gonna hate, hate, hate" in her song, *"Shake It Off."* But sometimes, haters don't just hate or say mean things. In Greer's case, they have ruined him: reputationally, emotionally, economically. Swift should have known that surely such representations would cause trauma and chaos, whether by her or by third parties.

94.     Swift also risked Greer's mental safety by making such representations and then the shock and blow of discovering that such determination wasn't welcomed by her is one of the reasons Greer has PTSD. The second rejection solidified the first, if there was any doubt of mind. And the harassment only made it worse.

95.     Indeed, "But For" Taylor Swift's lack of implementing disclaimers, Greer, a foreseeable third party, wouldn't have "gone to extremes", so to speak, to get Swift to see his efforts, such as initiating suit for the conduct of her agents because he truly believed that if she saw his efforts, that she would have been inspired, as Greer embodies everything Swift advocates for. Greer wouldn't have tried relying on an academic theory if there was no endorsement that such a theory-based action would be welcomed or noticed or understood. However, it wouldn't have mattered if he instead did a more low-key approach and did a video on YouTube to get it to trend and the same results happened because in either scenario: he relied on her representation and gets harmed.

96.     For the record, Greer, in a way to try getting over his Taylor Swift pain, reached out to other celebrities he admired, doing gifts that were frankly much better than the Swift gift, and he never sued or did anything outlandish for those celebrities to notice him because no

representation of helping others or commercially saying they like underdogs was ever given for Greer to rely upon, and so Greer took the risk of investing and didn't feel his investments were worth fighting for because there was no reliance or given representations like the ones Swift gave. And for all he knows, the Swift incident could have scared the others off, which is not a presumption because Greer had been talking to a publicist for a major celebrity and then the publicist vanished. The fact that Greer has not sued any of those celebrities should solidify his reliance **arguments as sincere**, and therefore, **reliance establishes causation**.

97.     Public Figures already do use disclaimers with their social media. On Twitter, Instagram and Facebook, public figures can request to have a blue verification check mark next to their name, so that it shows it's their real account, which protects them from fraud liability, since scammers like to pose as celebrities. *Celebrity Impostor Scams.* AARP. (2019) (https://www.aarp.org/money/scams-fraud/info-2019/fake-celebrity.html).    EXHIBIT  K.  An additional disclaimer with publicity stunts and social endorsements, whether it be a similar symbol or an advisory, would not be a burden to be implemented.

98.     The *conclusion with causatio*n is that we admit this event was foreseeable or we admit that Taylor Swift is clueless about her star power. Both conclusions can't co-exist.

## D.  DAMAGES

99.     With Swift's breach of duty to have disclaimers with her publicity stunts and intellectual property, and with the causation linking to that breach of duty, Greer has incurred physical, emotional, economical and monetary damages. Greer's day to day life is difficult with PTSD. It is hard for him to focus or to live a carefree life without encountering Swift's image or hearing her music in public places. His head tightened and he has to lie down often to get it to subside. Despite working with a counselor, Greer has been unable to work through his PTSD or bitter feelings towards Swift. Greer's trauma will be with him for the rest of his life. Compiling this

Complaint has been difficult, as he has had to encounter Swift's image and research her, finding things that enflame his PTSD.

100. With the advent of search engines and gossip, troll sites, which Greer has been a victim of many troll sites, Greer's online presence and reputation has been ruined, damages that will follow him for the rest of his life, thus becoming lifelong harm. Among the first results of him on search engines are the false news reports of him and Taylor Swift. Bloggers and commentators have taken their own spin on the ordeal and have defamed Greer's name. Even simply making a comment online, the demons twist his words, robbing him of the fundamental right of self-expression. The trolls will follow where Greer interacts online and say: "Watch out! He sued Taylor Swift for (XYZ of false information). Don't associate with him!" Greer is in constant fear that people he does business with will find the defamation and shun or fire him. Greer's professional career in the legal field is basically ruined, as he has become "unhireable". He is passed over for good jobs because of Taylor Swift. He's even been asked in job interviews, "Tell us about Taylor Swift."

101. Greer has lost family relationships, friend connections and business connections because of the trauma of Taylor Swift. His family tells him to "get over it," resulting in shouting matches and strained relationships. Greer's friends get annoyed by his focusing on the trauma of it, when nobody knows the pain of getting rejected by a public figure — twice — and the fallout that has resulted from it. Greer lost a connection with his publicist because of the 2019 event with Swift. Greer's own flesh and blood want nothing to do with him, thinking of him as deranged. To simply say, "get over it," is very hurtful and ignorant to what has happened.

102. Although Greer has showed sufficiently that his Complaint has merit, to solidify his damages, he wishes to contrast his case with other cases filed against Swift, that were blatantly frivolous, to emphasize the stark difference of true damages: Gyllenhaal v. Swift, No. 3:12-1145 (M.D. Tenn. Nov. 26, 2012) (Plaintiff claimed Swift stole his credit card and gave him herpes); *Darrow v. Swift*, Civil Action No. 15-12911-FDS (D. Mass. July 22, 2015) (two inmates claimed

Swift stole their idea for her album, "*1989,*" in the year 1989, disregarding the fact that she was born that year); *Mueller v. Swift,* Civil Action No. 15-cv-1974-WJM-KLM (D. Colo. May 31, 2017) (man sued Swift after sexually assaulting her. The case got way too much media attention over a frivolous claim); *Silva v. Tas Rights Mgmt.*, LLC, No. 3:18-cv-688-J-34JRK (M.D. Fla. Feb. 1, 2019) (a man, whose antics resemble John Hinckley Jr, has filed seven lawsuits against Swift for rather bizarre claims. Creepily admits to hopping the fence at Swift's mother's home). All of those cases were frivolous. Greer's Complaint clearly and truthfully states a claim for relief.

103.      Based on the severity of the harm Greer has suffered and Swift's breach of duty to warn, a jury at trial should determine the facts and determine that Swift should be found liable for twenty-two million dollars.

104.      Plaintiff asks for twenty-two million dollars for not only compensatory damages, which when calculating emotional damages, reputational damages, economical damages, loss of family relationships, puts the damage amount around twenty-two million, but also because the amount is symbolic: he was 22 when he decided he would impress Taylor Swift, and that decision, relying on her publicity, ruined his life. Greer would ask for punitive damages, but Tennessee law only allows punitive damages when the defendant has been reckless. Greer can only prove negligence. *Tennessee Code 29-39-104.* Plaintiff is happy to provide his calculations to the Court, if asked.

105.      With a finding of damages, it would cause a change in Swift's behavior and cause her to utilize disclaimers, which could result in the entire entertainment industry following suit. *In re Gammon, No. 01-34423, Adv. Pro. No. 01-3260 (Bankr. N.D. Ohio Jan. 5, 2002)* (the "primary purpose of damages is to cause a change in Defendant's behavior.") No contract is needed to establish liability.

## COUNT II

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

106.      Russell Greer realleges each and every allegation in paragraphs 1 through 105 hereof as if fully set forth herein.

107.      In order to state a claim for NIED, a Plaintiff must first establish the basic negligence claims, which Greer did so in Count I. *Kilpatrick v. Bryant,* 868 S.W.2d 594, 598 (Tenn. 1993).

108.      In Count I, Greer showed how Swift had a duty to warn, she breached her duty with her omissions, the proximate cause from the breach of duty to the damages can be traced to Swift, as her negligence created the damages he suffered from her and from others.

109.      In his damages and allegations, he provides proof that a licensed therapist diagnosed him with PTSD. EXHIBIT I.

110.      The diagnosis satisfies the last element of NIED, as "the claimed injury or impairment must be supported by expert medical or scientific proof." *Leong v. Takasaki*, 520 P.2d 758, 766-67 (Haw. 1974). No contract is needed to establish liability.

111.      Therefore, Greer has stated a claim for which relief can be granted. Plaintiff asks for the same relief as stated in paragraphs 103-104.

### COUNT III

### NEGLIGENT MISREPRESENTATION

112.      Russell Greer realleges each and every allegation in paragraphs 1 through 111 hereof as if fully set forth herein.

113.      The claim of negligent misrepresentation differs from a negligent failure to warn claim because it involves a "negligent misstatement, not just a non- disclosure." *McLachlan v. New York Life Ins. Co.,* 488 F.3d 624, 630 (5th Cir. 2007). Negligent misrepresentation involves

"careless words" and representations that aren't spoken. *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (N.Y. 1922). No contract is needed for this claim.

114.     A claim for negligent misrepresentation can be found in this case because the following elements were met: (1) Swift gave negligent, false misinformation by stating she praises underdogs and loves her fans, and by conveying through her actions that she welcomes gifts. Such statements are made by Swift to further her career and image in the music profession (2) Greer, a third party and consumer of her music and a follower of her social media, relied on her representations and information by investing money and man-hours to flatter her (3) Swift should have known that such misrepresentations would induce third parties to act and (4) Greer was harmed by relying on her representations. *Restatement (Second) of Torts section 311 (1965) (Negligent Misrepresentation Involving Risk of Physical Harm)* and *section 522.* See also: *Liability of Advertising Endorsers to Third Parties for Negligent Misrepresentation,51 OHio L. REV. 571, 578 (1970).*

115.     Plaintiff asks for the same relief as stated in paragraphs 103-104.


## COUNT IV

### NEGLIGENCE

116.     Russell Greer realleges each and every allegation in paragraphs 1 through 115  hereof as if fully set forth herein.

117.     A claim of ordinary negligence is much broader and is a more general cause of action, as opposed to failure to warn and negligent misrepresentation. *Grogan v. Uggla* (TN 2016).

118.     Rather than focus on Swift's failure to warn or her misrepresentations, this claim focuses generally on her omissions. The major difference between negligent misrepresentation and negligence is the Plaintiff need not show reliance. *Rottinghaus v Howell*, Wash App. 99, 66 P.2d 899 (WA 1983). No contract is needed to establish liability.

119.    Swift, as a public figure, had a duty to have realized that any omissions in her conduct or careless words could give the wrong impression. She breached her duty by not correcting or catching her omissions. The causation of the harm can be traced back to Swift for failing to use a reasonable inquiry into any omissions to have prevented Plaintiff from undertaking what he undertook. Plaintiff suffered damages as a result.

120.    In addition to FTC endorsement guides, other celebrities and those in the entertainment industry have argued that public figures should be held to a higher standard, thus a duty for Swift is found in public policy. *Kirk Cameron: Celebrities Should Be Held to a Higher Standard*. The Christian Post. (2014) (Kirk Cameron, an actor, states in the article: "we [celebrities] should be ***held to a higher standard*** because we're ***influencing*** more people than others might be. With the ***privilege of a platform*** comes great responsibility ... [We've] ***got to be careful with what we say.***" EXHIBIT L.

121.    Plaintiff asks for the same relief as stated in paragraphs 103-104.


## COUNT V

## DECLARATORY JUDGMENT

122.    Russell Greer realleges each and every allegation in paragraphs 1 through 121 hereof as if fully set forth herein.

123.    Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

124.    By reason of the foregoing, there is a present controversy between Russell Greer and Taylor Swift for which a declaratory judgment should be entered.

125.    Russell Greer has no adequate remedy at law.

## TRIAL BY JURY

126.    Russell Greer hereby requests trial by jury on all issues wherein trial by jury is permissible.

## PRAYER FOR RELIEF

WHEREFORE, Russell Greer prays for judgment against Taylor Swift as follows:

(1)    Compensatory damages in the amount of two million dollars.

(2)    General and special damages to be found by a jury in accordance with the facts, for the jury to find up to twenty million dollars.

(3)    An award of pre and post-judgment interest;

(4)    Russell Greer be awarded trial by jury on all issues triable by jury; and

(5)    Such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  May 25th, 2020

Respectfully submitted,

By:

Russell Greer
Pro Se Litigant
/rgreer/



## FedEx Express

### Extremely Urgent

**For FedEx Express® Shipments Only**

Contents should be compatible with the container and packed s[...]
For shipping terms and conditions and our limits of liability, refer [...]
applicable FedEx Express shipping document, the current FedEx [...]
Guide, or conditions of carriage.

For more information on FedEx Express services, solutions, and [...]
locations, go to **fedex.com**, or contact your nearest FedEx loca[...]

© 2018 FedEx 155475/155476 REV 3/18



See how FedEx connects the world in responsible and resource[...]
**environment.fedex.com**. Join our efforts by recycling this [...]

ORIGIN ID:BTFA  (385) 214-4590
RUSSELL GODFREY GREER
689 VINE STREET

MURRAY, UT 84107
UNITED STATES US

SHIP DATE: 27MAY20
ACTWGT: 1.05 LB
CAD: 6990527/SSFOZ110

BILL CREDIT CARD

TO
UNITED STATES DISTRICT COURT CLERK
801 BROADWAY
ROOM 800
NASHVILLE TN 37203
(615) 236-5498    REF:



**FedEx Express** **E**

TRK# 3932 7519 1474
(0201)

SH RNCA

MON – 01 JUN 8:00P
EXPRESS SAVER
RES
37203
TN-US   BNA